IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MOXTEK, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES WELDING, Inc., *dba* ROCKY MOUNTAIN AIR SOLUTIONS, <br><br> Defendant. | **MEMORANDUM DESCISION AND ORDER GRANTING MOTION TO DISMISS AND DENYING MOTION FOR JUDGMENT ON THE PLEADINGS IN PART** <br><br> Case No. 2:22-cv-00143-JNP-DAO <br><br> District Judge Jill N. Parrish |

On March 2, 2022, Plaintiff Moxtek, Inc. ("Moxtek") filed this lawsuit against Defendant United States Welding, Inc., *dba* Rocky Mountain Air Solutions ("RMA"). ECF No. 2. RMA and Moxtek entered into an agreement under which RMA supplied Moxtek with nitrogen. *Id.* Moxtek sought declaratory relief as to the parties' duties pursuant to the agreement. *Id.* On July 20, 2022, Moxtek amended its complaint. ECF No. 19. The amended complaint added a claim that RMA had tortiously interfered with Moxtek's economic and contractual relationships. *Id.* Before the court is a motion filed by RMA to dismiss Moxtek's claim for tortious interference with contract. ECF No. 23.

## BACKGROUND

Moxtek is a Delaware corporation whose principal place of business is located in Orem, Utah. ECF No. 19 at 1. RMA is a Colorado corporation whose principal place of business is located in Denver, Colorado. *Id.* at 2. On May 11, 1999, RMA and Moxtek entered into an agreement ("Agreement") pursuant to which RMA agreed to sell and Moxtek agreed to buy bulk nitrogen. *Id.*

The original Agreement was effective for five years. Agreement at 4, ECF No. 2-1. Unless terminated, the Agreement was set to automatically renew for a one-year term. *Id.* The parties reserved the right to terminate the Agreement for any reason by giving one-year advance written notice to the other party. *Id.* The parties also reserved the right to terminate the agreement if there was a substantial change in the price of nitrogen or the quantity ordered. *Id.* at 3–4.

Over the years, the parties executed multiple amendments to the Agreement that updated the pricing schedule and extended the term. ECF No. 19 at 4. In March 2015, the parties executed the most recent amendment, which extended the Agreement through November 1, 2025. *Id.*

In 2019, RMA began discussing the possibility of price increases with Moxtek. *Id.* On July 27, 2021, RMA informed Moxtek that, beginning on August 13, 2021, RMA intended to increase nitrogen prices by seven percent. *Id.* The Agreement provides that RMA reserves the right to increase prices, so long as RMA "give[s] [Moxtek] at least fifteen days prior written notice of any price increases." ECF No. 2-1 at 3. However, the Agreement also provides Moxtek with the right to "terminate this Service Agreement" so long as Moxtek provides satisfactory written evidence to RMA that Moxtek can buy nitrogen of a similar quality and quantity as that offered by RMA at a price lower than that offered by RMA, and RMA either refuses to meet the lower price or reinstate the price prior to the increase. *Id.*

Two days later, on July 29, 2021, Moxtek provided RMA with written evidence that Moxtek could purchase nitrogen from a competing supplier at a lower price than the price that RMA was charging. ECF No. 19 at 4. RMA started charging Moxtek the seven percent price increase on August 6, 2021. *Id.* at 5. However, on August 24, 2021, RMA retracted the increase and reinstated the original agreed upon price. *Id.*

2

On December 20, 2021, Moxtek informed RMA that Moxtek intended to terminate the Agreement but would continue to purchase nitrogen from RMA until September 30, 2022. *Id.* The next day, Moxtek emailed RMA additional details about the competing nitrogen supply offer it had received. *Id.* On December 27, 2021, RMA asked Moxtek to supply a more robust quote, and on January 4, 2022, Moxtek responded by emailing RMA a copy of the entire quote it had received. *Id.*

RMA deduced that Air Liquide USA, LLC ("Air Liquide"), another nitrogen supplier, had provided Moxtek with the competing quote. *Id.* at 6. On January 7, 2022, RMA sent an email to Moxtek accepting Moxtek's formal notice of cancellation dated December 21, 2021. RMA asserted however, that the Agreement would not terminate until October 31, 2025. *Id.*

On February 1, 2022, Moxtek emailed RMA to dispute RMA's claim that the Agreement was a requirements contract. *Id.* Moreover, Moxtek asserted that the termination would be effective on September 30, 2022. *Id.* At the same time that Moxtek had been negotiating with RMA, Moxtek had also been working with Air Liquide to finalize a Product Supply Agreement for bulk nitrogen. *Id.* at 7.

On February 16, 2022, RMA responded to Moxtek and reasserted that the Agreement was a requirements contract. *Id.* According to RMA, Moxtek was bound to purchase all of its nitrogen from RMA until November 1, 2025. *Id.* However, by this time, Moxtek had already signed an agreement to purchase nitrogen from Air Liquide. *Id.*

On the same day that RMA sent an email to Moxtek, RMA sent a letter to Air Liquide. *Id.* The letter states the following:

> This letter is to notify you that United States Welding, Inc., d/b/a/ Rocky Mountain Air Solutions ("RMA") has a current and

> enforceable product supply agreement to supply nitrogen to Moxtek, Inc., that is in effect until November 1, 2025.
>
> Richard E. Lofgren, President of RMA, is aware that your company recently provided Moxtek, Inc., with a Product Supply Agreement for nitrogen. Moxtek is not contractually free to enter into such a contract.
>
> This letter is to formally request that you immediately cease and desist from pursuing a nitrogen agreement with Moxtek, Inc. Failure to do so will damage RMA's contractual relationship with Moxtek, Inc., cause significant financial damage to RMA and may result in a civil suit for tortious interference with contract and business relations. RMA will pursue all legal remedies to protect its interests in its contracts.

Letter from Linda Creagan, Contract Manager, Rocky Mountain Air, to Air Liquide USA, LLC (Feb. 16, 2022), ECF No. 19-3.

After receiving the letter, Air Liquide refused to honor the product supply agreement it had previously signed with Moxtek. ECF No. 19 at 8. Air Liquide refuses to conduct any further business with Moxtek unless RMA withdraws the letter. *Id*. Moxtek alleges that it has suffered financial losses from Air Liquide backing out of the contract because the price of nitrogen has substantially increased since Moxtek's initial agreement with Air Liquide. *Id.*

## LEGAL STANDARD

A party must wait until "[a]fter the pleadings are closed" to move for a judgment on the pleadings pursuant to Rule 12(c). FED. R. CIV. P. 12(c). Pleadings include a complaint, answer, and sometimes, a reply. FED. R. CIV. P. 7. "A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).

Dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6) is appropriate where the plaintiff fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "The

4

court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citation omitted). Thus, when considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).

A complaint survives a motion to dismiss for failure to state a claim when the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint must allege more than labels or legal conclusions and its "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ANALYSIS

RMA filed a motion to either dismiss the tortious interference claim pursuant to Rule 12(b)(6) or for partial judgment on the pleadings pursuant to Rule 12(c). ECF No. 23 at 1. On the same day that Defendant filed this motion, Defendant filed a partial answer that did not address the tortious interference claim. ECF No. 24 at 1 ("In the event that the Court denies the Motion to Dismiss, RMA reserves the right to answer the Complaint's Fourth Cause of Action."). As the pleadings have not closed, the Rule 12(c) motion filed by RMA is premature. Therefore, the court DENIES RMA's motion for judgment on the pleadings under Rule 12(c) and addresses the motion as a motion to dismiss under Rule 12(b)(6).

Moxtek asserts that the letter that RMA sent to Air Liquide constitutes tortious interference with contract. ECF No. 19 at 12–13. RMA contends that the letter does not satisfy the elements of the tort claim. ECF No. 23 at 12. The parties also dispute whether Utah or Colorado law governs the tort claim. ECF No. 28 at 5–6; ECF No. 31 at 3–4. The court is persuaded that Utah law governs the tort claim, and that the letter does not sufficiently establish the elements of tortious interference with contract under Utah law. The court accordingly grants RMA's motion to dismiss Moxtek's claim for tortious interference with contract.

I. **Conflict of Law Analysis**

The court first addresses the choice of law governing Moxtek's claim of tortious interference with contract. Moxtek argues that the court should apply Colorado law to its tortious interference with contract claim. As an initial matter, Moxtek contends that there is a conflict between Utah and Colorado law with respect to the elements of a tortious interference with contract claim. Specifically, according to Moxtek, whereas Utah law requires a plaintiff to establish that the interference with contract occurred by "improper means," Colorado law has no such requirement unless the interference is between competitors. *See* ECF No. 28 at 9. Moxtek asserts that the exception is not relevant here, *see id.* at 6, note 3, and therefore, the court must determine which state has the most significant relationship to the claim.

Moxtek argues that Colorado has the most significant relationship to the tortious interference claim. *Id.* at 6. First, Moxtek contends that it sustained the alleged economic injury nationally because it supplies its products across the United States. *Id.* at 5. Therefore, according to Moxtek, the location of the misconduct is the most important factor in determining the state with the most substantial relationship to the tort claim. *Id.* Since RMA sent the letter from Colorado, the misconduct occurred in Colorado. *Id.* at 5–6. To further support the applicability of

Colorado law, Moxtek notes that RMA is a Colorado corporation with its principal place of business in Colorado. *Id.* And the Agreement between RMA and Moxtek contains a clause specifying that it shall be governed by Colorado law. ECF No. 2-1 at 5. For these reasons, Moxtek argues that the court should apply Colorado law to the tortious interference claim.

RMA does not dispute that there is a conflict between Utah and Colorado law with respect to the essential elements of a tortious interference claim. However, RMA contends that Utah is the state with the most significant relationship to the tort claim. RMA asserts that, contrary to Moxtek's contentions, the alleged economic injury did not occur nationally, but would predominantly be felt in Utah. ECF No. 31 at 5. "For more than twenty years, RMA has been delivering to and servicing Moxtek's unique needs exclusively in Utah." *Id.* at 5. "RMA does not deliver nitrogen to Moxtek in Colorado. Nor are the customized storage tanks that Moxtek is renting from RMA located in Colorado." *Id.* at 4–5. The contract between Air Liquide and Moxtek, that Moxtek alleges was the subject of the interference, concerned nitrogen delivery in Utah. *Id.* The business opportunity is centered in Utah, and RMA allegedly interfered with a business transaction that primarily affects Utah's economy. RMA asserts that because performance of the contract occurs exclusively in Utah, and the injury occurred in Utah, Utah has the most substantial relationship to the tort claim. The court agrees.

As a preliminary matter, the court agrees with Moxtek that there is a true conflict between Colorado and Utah law with respect to the elements of a tortious interference with contract claim. "In order to win a tortious interference claim under Utah law, a plaintiff must . . . prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *Davidson v. Baird*, 438 P.3d 928, 945 (Utah Ct. App. 2019) (quoting *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015)). In contrast,

under Colorado law, "[t]ortious interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995) (internal citation omitted). Colorado courts consider seven factors to determine whether the interference is tortious:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Id.*

As Moxtek notes, Utah law requires the plaintiff to establish that the defendant interfered with the contract by improper means—such as "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood[s]," *C.R. Eng. v. Swift Transp. Co.*, 437 P.3d 343, 353 (Utah 2019) (citation omitted). In contrast, Colorado law has no such requirement for the type of interference alleged here. Because the outcome of Moxtek's tortious interference claim could depend on whether Utah or Colorado law is applied, there is a true conflict between the states' laws, and the court must conduct a conflict of laws analysis. *See Johnson v. Blendtec, Inc.*, 500 F. Supp. 3d 1271, 1279 (D. Utah 2020).

Because this case comes before the court on diversity jurisdiction pursuant to 28 U.S.C. § 1332, the court applies Utah's conflict of laws rules to determine the applicable law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (holding that a federal court sitting in diversity jurisdiction applies the conflict of laws analysis of the forum state). To determine "which state's laws should apply to a given circumstance" when there is a true conflict of laws, Utah courts "apply the 'most significant relationship' approach as described in the Restatement (Second) of Conflict

8

of Laws." *Soundvision Techs., LLC v. Templeton Grp. Ltd.*, 929 F. Supp. 2d 1174, 1192 (D. Utah 2013) (internal citation omitted).

> Utah courts consider the following factors when determining which state has the most significant relationship to a tort dispute: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."

*Id.* (internal citation omitted). "Further, 'these contacts are to be evaluated according to their relative importance with respect to the particular issue.'" *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1060 (Utah 2002) (quoting Restatement (Second) Conflict of Laws § 145(2) (1971)).

Utah bears the most significant relationship to the tort claim. As RMA notes, the injury occurred in Utah. Moxtek's principal place of business is in Utah, and the alleged interference involved a contract for the delivery of nitrogen to sites in Orem, Utah. Moxtek does not dispute that the injury occurred in Utah, but rather asserts that because Moxtek ships products nationally, and the harm is economic in nature, the court should emphasize the location of the misconduct, which is Colorado. The court disagrees. Simply because Moxtek ships its products nationally does not imply that RMA's behavior injured Moxtek nationally. Moxtek and RMA's relationship is overwhelmingly centered in Utah, and the ramifications of RMA's allegedly tortious conduct are only felt in Utah. The contract between RMA and Moxtek requires performance in Utah, and the contract between Moxtek and Air Liquide, with which Moxtek alleges that RMA tortiously interfered, is also centered in Utah. Therefore, Utah has the most significant relationship to Moxtek's tortious interference claim and the court will analyze the claim under Utah law.

## II.     Substantive Analysis

Under Utah law, a tortious interference with contract claim consists of three elements: "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *Baird*, 438 P.3d at 945 (Utah Ct. App. 2019) (quoting *Eldridge*, 345 P.3d at 565). The parties agree that Moxtek has sufficiently alleged the first and third elements of the tortious interference claim. RMA intentionally interfered with the potential relationship between Moxtek and Air Liquide. This injured Moxtek. The sole remaining question is whether RMA's letter to Air Liquide satisfies the element of improper means.

"[A] person could be held liable for the tort of intentional interference with contract only if the person interfered in a way in which the person was not legally entitled to have interfered." *C.R. Eng.*, 437 P.3d at 347. To protect free market economies, Utah courts have "defined improper means narrowly" as businesses "inevitably damage one another" competing for customers. *Id.* at 353. "[T]he element of 'improper means is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common law rules,' or if 'they violate an established standard of a trade or profession.'" *Id.* at 344 (internal citation omitted). Moxtek proffers two theories as to how RMA's letter to Air Liquide satisfies the improper means element. Under the first, Moxtek alleges that RMA's letter independently constitutes tortious misrepresentation. ECF No. 28 at 10. Under the second, Moxtek alleges that RMA threatened Air Liquide with unfounded litigation. *Id.* at 12. However, the court is unpersuaded that the letter supports a plausible tortious misrepresentation claim or that RMA's threats of litigation rise to the level of impropriety necessary to sustain a tortious interference with contract claim under Utah law.

### A. Tortious misrepresentation

As an initial matter, Moxtek correctly states that the tort of misrepresentation can satisfy the improper means element of a tortious interference with contract claim. *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1329 (D. Utah 2020). This is because misrepresentation is a standalone tort. *Id.* ("Conduct that is not independently tortious or wrongful is insufficient to establish the improper means prong of a tortious interference claim."). A defendant who makes a false statement, concerning "a presently existing material fact," and "induce[s] reliance upon that statement" has engaged in the tort of misrepresentation. *Id.* Moxtek asserts that RMA's letter to Air Liquide constitutes tortious misrepresentation. The court disagrees.

Generally, a misstatement of law cannot support a claim of tortious misrepresentation. *Ackerman v. Bramwell Inv. Co.*, 12 P.2d 623, 626 (Utah 1932) ("The general rule is that misrepresentations of law or of the legal effect of contracts and writings does not constitute remedial fraud."). However, exceptions exist. *See* Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 69:10 (4th ed. 2022) (enumerating four exceptions to the rule). For example, legal opinions that implicitly embody factual representations can support a claim for tortious misrepresentation. *See Gadd v. Olson*, 685 P.2d 1041, 1044 (Utah 1984). As Williston clarifies:

> A representation that a contract has been terminated because certain events occurred is one of both fact and opinion; to the extent it expresses a judgment regarding the legal consequences flowing from the facts it is opinion, but to the extent it expresses a judgment regarding the legal consequences flowing from the facts it is opinion, but to the extent that it recites past events, it is factual.

Williston & Lord, *supra*, § 69:10.

Moxtek alleges that the letter that RMA sent to Air Liquide contains two false statements. First, that Moxtek was not "contractually free" to work with Air Liquide. Creagan Letter, ECF No. 19-3. Second, that Moxtek and RMA were engaged in "a current and enforceable product supply agreement . . . that is in effect until November 1, 2025." *Id.* The more accurate characterization of these statements is that they are legal opinions and not statements of fact. The letter that RMA sent to Air Liquide informs Air Liquide that Moxtek is not contractually free to work with Air Liquide because RMA has a contract with Moxtek. *Id.* This is a legal opinion about Moxtek's duties pursuant to the Agreement. Moxtek claims that RMA misrepresents "Moxtek's capability and availability to enter into contracts with anyone other than RMA." ECF No. 28 at 12. But Moxtek fails to articulate an underlying false factual statement.

According to Moxtek, *Hyde*, *Adamson*, and *Gadd* support the position that misstatements of law can embody factual misrepresentations. *See Hyde v. Provo City*, No. 2:03CV-0120 DAK, 2004 WL 1144058 (D. Utah May 18, 2004); *Adamson v. Brockbank*, 185 P.2d 264 (Utah 1947); *Gadd*, 685 P.2d at 1041. However, these cases are distinguishable. In *Hyde*, the defendant misrepresented that plaintiff was an at-will employee. *Hyde* at *4. The plaintiff's employment status was a legal question, but it was not "purely a statement of opinion." *Id.* (internal citation omitted). It was also a "representation as to legal matters which of necessity implicates facts . . . ." *Id*. *Hyde* can be distinguished because Moxtek has failed to identify a false fact that would be implicated as a result of RMA's purported misstatements.

*Adamson* and *Gadd* stand for the proposition that a defendant will not be able to escape the tort of misrepresentation by cloaking a factual misrepresentation as a legal opinion. In *Adamson*, the defendant attempted to use a quitclaim deed to extinguish an easement owned by plaintiffs. 185 P.2d at 275. The defendant had convinced the plaintiffs to sign a quitclaim deed by telling

12

them that the sole reason that the defendant was seeking a quitclaim deed was to clarify a boundary dispute and that the deed would be used only for that limited purpose. *Id*. at 274. The defendant subsequently attempted to claim that his statements were not actionable because they concerned the scope of a deed. *Id.* at 275. However, the Utah Supreme Court held that because the defendant had made a factual misrepresentation regarding "the purpose and effect of the deed," the rights that the defendant "intended to acquire under [the] deed [are] not a question of law but a question of fact." *Id.* at 276.

*Gadd* involved a similar situation as *Adamson*. In *Gadd*, the defendant attempted to claim that his representations regarding the contents of loan documents were not actionable because the loan documents were legal instruments. 685 P.2d at 1044. However, the court ruled against the defendant and found that the defendant had falsely misrepresented to plaintiffs that "he was in the business of helping people save their houses from foreclosure and would loan appellants enough money to save theirs." *Id.* Unlike *Adamson* and *Gadd*, RMA is not trying to shield a factual misrepresentation as a legal statement. There is no factual question in dispute here as Moxtek's capacity to enter into a contract is not a factual matter. Rather, it is a "nonactionable misrepresentation of legal opinion involv[ing] the legal meaning and effect" of the contract between RMA and Moxtek. Williston & Lord, *supra*, § 69:10.

Even if the court were to conclude that RMA's letter contained a factual representation about the Agreement between RMA and Moxtek, Moxtek cannot demonstrate that RMA's representation was false. Moxtek claims that RMA misrepresented that the Agreement between RMA and Moxtek was a requirements contract, and that the Agreement was effective until November 1, 2025. ECF No. 28 at 12. However, Moxtek is currently requesting declaratory relief to determine the effective termination date of the contract and whether the contract between RMA

13

and Moxtek is a requirements contract. *See* ECF No. 19 at 8–9. At the time that RMA sent the letter to Air Liquide, there had been no adjudication that the contract was not a requirements contract or that it terminated prior to November 1, 2025. In fact, on the same day that RMA sent the letter to Air Liquide, RMA reasserted to Moxtek that the Agreement was a requirements contract that did not terminate until November 1, 2025. *Id.* at 7. Even if the court were persuaded that RMA's letter necessarily implicated facts about the contract, Moxtek has not pled facts that demonstrate the falsity of RMA's statements.

In short, the court is not persuaded that RMA's letter constitutes tortious misrepresentation. RMA's letter contains legal opinions regarding Moxtek's ability to contract. Moreover, even if the legal opinion necessarily implicates a factual matter, Moxtek has not pled any facts that demonstrate that RMA's representations were false. Thus, the court is not persuaded that RMA's letter gives rise to the tort of misrepresentation.

B.   Improper Threats of Litigation

Having addressed Moxtek's contention that the letter that RMA sent to Air Liquide does not satisfy the tort of misrepresentation, the court moves to Moxtek's alternative claim that the letter satisfies the improper means element because RMA improperly threatened Air Liquide with litigation. As a threshold matter, the court agrees with Moxtek that RMA did not "softly speculate[]" about the possibility of a lawsuit. ECF No. 23 at 19. RMA threatened to sue Air Liquide. *See* Creagan Letter, ECF No. 19-3 ("This letter is to formally request that you immediately cease and desist . . . . Failure to do so . . . may result in a civil suit for tortious interference with a contract and business relations.").

However, the court is unaware of, and Moxtek fails to cite, any Utah law suggesting that threats of improper litigation constitute improper means. *See* ECF No. 28 at 10. Moxtek argues

14

that "if a threat may constitute improper means, and unfounded litigation may constitute improper means, then a threat of unfounded litigation may constitute improper means." *Id.* But this logic is flawed. Under Utah law, improper means requires conduct that is independently unlawful. *C.R. Eng.*, 437 P.3d at 354 ("[W]e have been careful to limit the scope of actionable conduct within the tortious interference context to those situations where a defendant employs a means that is independently tortious or wrongful."). Threats that are independently unlawful, such as threats to inflict violence, are improper. *See* UTAH CODE ANN. § 76-5-107. Similarly, if a party engages in unfounded litigation that rises to the level of abuse of process or wrongful use of civil proceedings, the party will have engaged in a common law tort. *See Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 341 (Utah 2005) (explaining that to prove abuse of process, plaintiff must allege that defendant engaged in "an ulterior purpose" and committed "an act in the use of the process not proper in the regular prosecution of the proceedings"; to prove wrongful use of civil proceedings, plaintiff must allege that defendant "institu[ted] or maintain[ed] civil proceedings for an improper purpose and without a justifiable basis."). This also satisfies the improper means element. But Moxtek does not cite to any authority suggesting that the threat of improper litigation constitutes improper means. Because Utah law does not establish the independent unlawfulness of a threat of unfounded litigation, RMA's threat to sue Air Liquide does not constitute an improper means.

      RMA's threats against Air Liquide are not actionable even under the standards of a jurisdiction that recognizes that threats of litigation can give rise to a tortious interference with contract claim. "[T]hreat[s] of litigation are powerful weapons" that may induce a party to refrain from entering into a contractual relationship. Restatement (Second) of Torts § 767 (1979). However, not all threats of litigation are wrongful. *Id.* Threats of litigation are "ordinarily wrongful if the actor has no belief in the merit of the litigation or if, though having some belief in the merit

15

. . . [the actor] . . . threatens to institute the litigation in bad faith, intending only to harass the third parties . . . ." *Id.*

Moxtek argues that the threats RMA made against Air Liquide were wrongful because RMA could not have reasonably believed that it would succeed on a tortious interference with contract claim against Air Liquide. On this narrow matter, the court agrees. Absent illegal means, competing against a rival cannot support a tortious interference with contract claim. *C.R. Eng.*, 437 P.3d at 353 (explaining that plaintiffs cannot recover for actions that are "an inevitable byproduct of competition."). The only action undertaken by Air Liquide was to enter into an agreement with Moxtek. Based on this action alone, RMA could not bring a plausible tortious interference with contract claim against Air Liquide. But the threat of the tortious interference with contract claim against Air Liquide must be interpreted in the context of the entire letter.

> This letter is to formally request that you immediately cease and desist from pursuing a nitrogen agreement with Moxtek, Inc. Failure to do so will damage RMA's contractual relationship with Moxtek, Inc., cause significant financial damage to RMA and may result in a civil suit for tortious interference with a contract and business relations. RMA will pursue all legal remedies to protect its interests in its contracts.

Creagan Letter, ECF No. 19-3. RMA did not threaten Air Liquide only with tortious interference with contract, but with "all legal remedies." *Id.* RMA did not make a standalone meritless threat against Air Liquide. The more accurate characterization of the situation is that RMA sent Air Liquide a cease-and-desist letter to protect, what RMA reasonably believed, were its contractual rights to exclusively supply Moxtek with nitrogen.

A party believing that it has an exclusive contract and that sends a cease-and-desist letter to a rival who the party believes may participate in causing a breach of that contract will not be liable for tortious interference. Restatement (Third) of Torts: Liab. for Econ. Harm § 20 (2020)

16

(explaining that a magazine that contracts with a freelancer for exclusive rights to a story and then sends a cease-and-desist letter deterring a rival from publishing the story will be privileged against a tortious interference with contract claim brought by the freelancer against the magazine, so long as the magazine in good faith believed that it had the exclusive rights to the story). There is no suggestion here that RMA sent the letter to Air Liquide absent any belief in its contractual rights. *See* Restatement (Second) of Torts § 767 (1979) ("A typical example of this situation is the case in which the actor threatens the other's prospective customers with suit for the infringement of his patent and either does not believe in the merit of his claim or is determined not to risk an unfavorable judgment . . . ."). RMA sent the letter to Air Liquide believing that it had exclusive rights to supply nitrogen to Moxtek. RMA asserted this belief then and continues to assert this position in defending this lawsuit. Because RMA sent Air Liquide, its competitor, a cease-and-desist letter to protect what it believed were its exclusive rights, the letter alone cannot sustain Moxtek's tortious interference claim. The court is persuaded that, taken as a whole, the letter is not an improper threat of litigation.

In short, the threats of litigation contained in RMA's letter do not satisfy the improper means element of tortious interference with contract. Utah does not recognize threats of litigation as independently unlawful. Even if it did, considering the letter in its entirety, the threats of litigation do not rise to the level of improper means.

## CONCLUSION AND ORDER

Moxtek has failed to establish the improper means element required to sustain a tortious interference with contract claim under Utah law. The letter RMA sent to Air Liquide does not establish tortious misrepresentation and Utah does not recognize threats of litigation as

independently unlawful. For the foregoing reasons, the court GRANTS RMA's motion to dismiss Moxtek's claim of tortious interference with contract. ECF No. 23.

DATED March 3, 2023.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge